THOMAS E. MONTGOMERY, County Counsel (SBN 109654)
County of San Diego
By JOSHUA M. HEINLEIN, Senior Deputy (SBN 239236)
1600 Pacific Highway, Room 355
San Diego, California 92101-2469
Telephone: (619) 531- 5850; Fax: (619) 531-6005
E-mail: Joshua.heinlein@sdcounty.ca.gov

Attorneys for COUNTY OF SAN DIEGO

# IN THE UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NEIGHBORHOOD MARKET ASSOCIATION, INC., and VAPIN' THE 619, | No. 20-cv-01124-H-WVG |
| Plaintiffs, | **DEFENDANT COUNTY OF SAN DIEGO'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS COMPLAINT [FRCP 12(b)(6)]** |
| v. | |
| COUNTY OF SAN DIEGO, | Date: September 14, 2020 |
| Defendant. | Time: 10:00 a.m. |
| | Courtroom: 15A |
| | Judge: Marilyn L. Huff |
| | Magistrate Judge: William V. Gallo |
| | Action Filed: June 19, 2020 |
| | Trial Date: None Set |

# TABLE OF CONTENTS

**Page(s)**

TABLE OF AUTHORITIES .................................................................................. 3

I.   INTRODUCTION ........................................................................... 5

II.  STATEMENT OF FACTS .................................................................. 6

A. The Sale of Flavored Tobacco and Electronic Smoking Products Presents
    a Risk to Public Health and Safety—Particularly to Youth ................... 6

B. The County Adopted The Ordinance To Address These Problems .................... 8

III. THE COMPLAINT SHOULD BE DISMISSED WITH PREJUDICE.................. 9

A. The Federal Act Does Not Preempt the County's Ordinance. ........................... 10

   1.  The Ordinance is Not Expressly Preempted ................................... 10

   2.  The Ordinance is Not Impliedly Preempted.................................... 18

       a.  Congress Did Not Intend to Prevent State and Local Governments
           From Banning Tobacco Sales, Even Completely .................................. 19

       b.  Congress Did Not Intend To Foreclose State And Local
           Governments  From Deciding Whether To Ban The Sale Of
           Flavored Tobacco By Delegating The Establishment Of National
           Product Standards For Menthol-Flavored Cigarettes To The FDA......... 21

IV.  CONCLUSION....................................................................................23

No. 20-cv-01124-H-WVG

# TABLE OF AUTHORITIES

**Cases**     **Page(s)**

*Altria Grp., Inc. v. Good*, 555 U.S. 70 (2008) .......................................................... 10

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ...................................................................... 9

*Ass'n des Eleveurs de Canards et d'Oies du Que. v. Becerra*,
    870 F.3d 1140 (9th Cir. 2017) ............................................................................... 18

*Bates v. Dow Agrosciences L.L.C.*, 544 U.S. 431 (2005) .............................. 10, 18, 22

*Beaver v. Tarsadia Hotels*, 816 F.3d 1170 (9th Cir. 2016) ........................... 10, 18, 22

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ....................................................... 9

*Berger v. Philip Morris USA, Inc.*, 185 F. Supp. 3d 1324 (M.D. Fla. 2016) ........... 20

*Cal. Pub. Emps. Ret. Sys. v. Worldcom, Inc.*, 368 F.3d 86 (2d Cir. 2004) .............. 13

*Child.'s Hosp. & Health Ctr. v. Belshe*, 188 F.3d 1090 (9th Cir. 1999) ................... 11

*Colgate v. Juul Labs, Inc.*, 402 F. Supp. 3d 728 (N.D. Cal. 2019) .......................... 17

*Evans v. Lorillard Tobacco Co.*, 465 Mass. 411 (2013) ........................................... 21

*FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120 (1999) ............................ 6

*First Amendment Coal.* v. U.S. DOJ, 878 F.3d 1119 (9th Cir. 2017) ....................... 11

*Gonzalez v. Drew Indus.*, 750 F. Supp. 2d 1061 (C.D. Cal. 2007) .......................... 10

*Graham v. R.J. Reynolds Tobacco Co.*, 857 F.3d 1169 (11th Cir. 2017) ........... 10, 18

*Griffin v. Oceanic Contractors*, 458 U.S. 564 (1982) .............................................. 11

*Harris v. R.J. Reynolds Vapor Co.*, No. 15-cv-04075-JD, 2017 WL 3617061
    (N.D. Cal. Aug. 23, 2017) ..................................................................................... 17

*In re Fontem US, Inc. Consumer Class Action Litig.*, No. SACV 15-02018 JVS(RAOx),
2016 WL 6520142 (C.D. Cal. Nov. 1, 2016) ............................................................ 17

*Independents Gas & Serv. Stations Ass'ns v. City of Chi.*,
112 F. Supp. 3d 749 (N.D. Ill. 2015) ........................................................ 6, 14, 15, 16

*Inhale, Inc. v. Starbuzz Tobacco, Inc.*, 755 F.3d 1038 (9th Cir. 2014) ................... 15

*Izzarelli v. R.J. Reynolds Tobacco Co.*, 701 F. App'x 26 (2d Cir. 2017) ................. 20

*James v. City of Costa Mesa*, 700 F.3d 394 (9th Cir. 2012) .................................... 11

*Kuhne v. Reynolds*, No. 3:01cv1090 (WWE), 2019 WL 959678
    (D. Conn. Feb. 27, 2017) ....................................................................................... 21

*Lamie v. U.S. Tr.*, 540 U.S. 526 (2004) .................................................................... 11

*Major v. R.J. Reynolds Tobacco Co.*, 14 Cal. App. 5th 1179 (2017) ............. 14, 20, 21

*Nat'l Ass'n of Tobacco Outlets v. City of Providence*,
731 F.3d 71 (1st Cir. 2013) ........................................................................ 6, 14, 15, 16

*Nat'l Meat Ass'n v. Harris*, 565 U.S. 452 (2012) ............................................... 16, 17

*U.S. Smokeless Tobacco Mfg. Co. v. City of N.Y.*, 708 F.3d 428 (2d Cir. 2013) .............. passim

# TABLE OF AUTHORITIES
## (Continued)

**Cases**                                                                                    **Page(s)**

*United States v. Flores*, 729 F.3d 910 (9th Cir. 2013) ............................................... 11

*United States v. Wenner*, 351 F.3d 969 (9th Cir. 2003) ............................................. 11

**Statutes**

**California Penal Code**
    Section 599f(b) ................................................................................................ 16

**21 U.S.C.**
    Section 387b(a)(1)(B) ..................................................................................... 12
    Section 387g ......................................................................................... 12, 19, 21
    Section 387g(a) ............................................................................................... 12
    Section 387g(a)(1)(A) ..................................................................................... 12
    Section 387g(a)(2) ........................................................................................... 12
    Section 387p .................................................................................................... 11
    Section 387p(a)(1) ..................................................................................... *passim*
    Section 387p(a)(2)(A) ..................................................................................... 12
    Section 387p(a)(2)(B) ................................................................................ 12, 17
    Section 678 (2018) ......................................................................................... 16

**Fed. R. Civ. P.**
    Rule 12(b)(6) .................................................................................................... 9
    Rule 8(a) ............................................................................................................ 9

**Other**

83 Fed. Reg. 12,294 (Mar. 21, 2018) ............................................................... 6

**Family Smoking Prevention and Tobacco Control Act (FSPTCA)**
    Section 907(b)(3) (2005) ............................................................................... 19

**San Diego Code (SD Code)**
    Section 32.881(d) ......................................................................................... 6, 7
    Section 32.881(e) ............................................................................................. 8
    Section 32.882(c) ........................................................................................... 15
    Section 32.883(c) ........................................................................................... 15
    Section 32.891(a)-(e) ........................................................................................ 7
    Section 32.891(b) ............................................................................................. 7
    Section 32.891(g) ....................................................................................... 8, 15
    Section 32.892(b) ............................................................................................. 9

# I.   **INTRODUCTION**

Beginning in 2018, the use of e-cigarettes and particularly flavored tobacco products increased rapidly among school-aged children. Indeed, in 2019, 27.5% of high school students reported using e-cigarettes, the overwhelming majority of which smoked flavored tobacco. The summer of 2019 also saw a rash of severe illnesses and deaths linked to the use of e-cigarettes. In response, the County of San Diego ("County") enacted Ordinance No. 10647 ("Ordinance"), which bans the sale of flavored tobacco in the unincorporated areas of the County and temporarily pauses the sale of electronic smoking devices. (ECF No. 1-2.)[1]

The Ordinance prohibits in-store sales of flavored tobacco products and temporarily pauses the sale of electronic smoking products in unincorporated areas of the County. Its purpose is to curb the public health epidemic of use by County youth of flavored tobacco products, and vaping products in particular, that cause pulmonary diseases and a host of other harmful health issues. The COVID-19 pandemic has only made the need to curb vaping by young people more apparent. Couple COVID-19 with the fact that over 49% of tobacco shop retailers have sold to minors in recent compliance checks and the need for the Ordinance is even clearer.

Despite those legitimate public health concerns, Plaintiffs Neighborhood Market Association, Inc. and Vapin' the 619 ("Plaintiffs") ask this Court to elevate their economic interests over the pulmonary health of all school-aged children living in unincorporated areas of the County. Plaintiffs' Complaint alleges two claims for relief—express preemption and implied preemption—contending that the federal Family Smoking Prevention and Tobacco Control Act ("Act") preempts the Ordinance. Both of Plaintiffs' federal preemption claims for relief fail because the very provision of the Act upon which they rely expressly permits local laws like the Ordinance, and the only cases to address bans of flavored tobacco products all have upheld them, rejecting the same claims asserted

---

[1] A copy of the Ordinance is attached hereto as Exhibit A for the Court's reference.

by Plaintiffs here. *See U.S. Smokeless Tobacco Mfg. Co., LLC v. City of New York*, 708 F.3d 428, 432 (2d Cir. 2013); *National Ass'n of Tobacco Outlets, Inc. v. City of Providence, Rhode Island*, 731 F.3d 71 (1st Cir. 2013); *Independents Gas & Service Stations Assocs., Inc. v. City of Chicago*, 112 F. Supp. 3d 749, 754 (N.D. Ill. 2015). In fact, just recently the U.S. District Court for the Central District of California upheld Los Angeles County's ban on the sale of flavored tobacco products against nearly identical challenges to the one brought by Plaintiffs. (Request for Judicial Notice ["RJN"], Exs. 1 and 2.)

Therefore, the Court should grant the County's motion and dismiss Plaintiffs' Complaint without leave to amend.

## II.   STATEMENT OF FACTS

### A.   The Sale of Flavored Tobacco and Electronic Smoking Products Presents a Risk to Public Health and Safety—Particularly to Youth

"[T]obacco use, particularly among children and adolescents, poses perhaps the single most significant threat to public health in the United States." *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 161 (1999). To protect school-aged children living in unincorporated areas of the County, the County enacted the Ordinance, which, as explained below, prohibits the sale of flavored tobacco products.

In so doing, the County specifically recognized that flavored tobacco products, including those flavored with menthol, are as harmful as unflavored products, but mask tobacco's harsh taste, thereby lowering the barrier to entry for County youth with the potential to make them lifelong tobacco users. (ECF No. 1-2, § 32.881(d)[2].) This is by design. *See Independents Gas & Service Stations*, 112 F. Supp. 3d at 751 (referencing "studies showing that the tobacco industry employs a deliberate strategy to recruit and

---

[2] *See also* Bridget K. Ambrose, et al., *Flavored Tobacco Product Use Among US Youth Aged 12-17 Years, 2013-2014*, 314(7) JAMA 1871-3 (2015), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6467270/; FDA, Regulation of Flavored in Tobacco Products, Advance notice of proposed rulemaking, 83 Fed. Reg. 12,294, 12,295 (March 21, 2018), https://www.govinfo.gov/content/pkg/FR-2018-03-21/pdf/2018-05655.pdf.

1   addict young smokers by adjusting the menthol to create a milder experience for the first-

2   time smoker." (internal quotations omitted)).

3        This attractiveness of flavored products to young persons is only exacerbated by

4   vaping products or e-cigarettes—electronic devices that heat up a liquid often containing

5   nicotine and other cancer-causing chemicals. (ECF No. 1-2, § 32.891(a)-(e).) Such

6   products come in various fruit and candy flavors, and other flavors designed to appeal to

7   children like "Tooth Fairy Puff," "Cotton Candy," and "Sour Gummy Worms." (ECF No.

8   1-2, § 32.881(d);[3] see also RJN, Ex. 3.) It is apparent that adults are not the target

9   demographic of such products.

10       The County, along with other national and state authorities, has seen a surge in

11  youth vaping. (ECF No. 1-2, § 32.891(b).) Nearly thirty percent of high schoolers have

12  vaped or used an e-cigarette. (*Id.*) Of youth who use tobacco, over 86% report their first

13  product as flavored, and fruit and sweet flavors are most popular for vaping teens.[4] Over

14  5.3 million youth were current e-cigarette users in 2019 – a remarkable increase of over 3

15  million students since 2017.[5]

16       Beyond these acute pulmonary harms, nicotine vaping products (like traditional

17  tobacco products), cause systemic health problems, "leading the Food and Drug

18  Administration Commissioner and the US Surgeon General to declare youth e-cigarette

19  use an epidemic in 2018."[6] They are highly addictive, and adversely affect the

20

21       [3] See also King, B.A., Dube, S.R., & Tynan, M.A. (2012). Flavored cigar smoking among U.S. adults: Findings from the 2009 – 2010 National Adult Tobacco Survey. *Nicotine & Tobacco Research*, 15(2), 608-614.

22       [4] Vuong TD, Zhang X, Roeseler A. California Tobacco Facts and Figures 2019. Sacramento, CA: California Department of Public Health; May 2019, available at

23  https://www.cdph.ca.gov/Programs/CCDPHP/DCDIC/CTCB/CDPH%20Document%20Library/ResearchandEvaluation/FactsandFigures/CATobaccoFactsandFigures2019.pdf.

24       [5] CDC, *Tobacco Product Use and Associated Factors Among Middle and High School Students—United States, 2019*, 68(12) MMWR 18 (Dec. 6, 2019), https://www.cdc.gov/mmwr/volumes/68/ss/pdfs/ss6812a1-H.pdf.

25

26       [6] Cullen KA, Gentzke AS, Sawdey MD, et al. e-Cigarette Use Among Youth in the United States, 2019. *JAMA*. 2019;322(21):2095–2103. doi:10.1001/jama.2019.18387; see

27  US Department of Health and Human Services. Surgeon General's advisory on e-cigarette use among youth. https://e-cigarettes.surgeongeneral.gov/documents/surgeon-

28  generals-advisory-on-ecigarette-use-among-youth-2018.pdf.

1   cardiovascular, pulmonary, and other bodily systems at any age, but have additional,

2   outsized, negative health effects on adolescent brain development, particularly with

3   regard to attention span, learning, and memory.[7] Because the concentration and amount

4   of nicotine in e-cigarettes and vaping liquids is not always clear, adolescents might

5   consume the equivalent amount of nicotine found in an entire pack of cigarettes, in a

6   single pod of vaping liquid. At the same time, compliance checks on the industry found

7   that 49% of tobacco retailers did not comply with already existing restrictions on the sale

8   of products to underage customers. (ECF No. 1-2, § 32.881(e).)

9       The summer of 2019 also saw a rash of severe illnesses and deaths associated with

10   electronic smoking devices. As set forth in the Ordinance, "Electronic smoking devices

11   have been implicated in an acute public health crisis that began in the summer of 2019.

12   E-cigarette, or vaping, product use associated lung injury (EVALI), formerly known as

13   vaping-associated pulmonary injury (VAPI), has led to hospitalizations and deaths

14   nationwide, including in California. There have been 41 confirmed or probable EV ALI

15   cases in San Diego County as of December 18, 2019 (most recent data as of docket date).

16   In response, the California Department of Public Health has urged the public to

17   immediately cease using electronic smoking devices..." (ECF No. 1-2, § 32.891(g). See

18   also RJN, Exs. 4-5.)

19       **B.    The County Adopted The Ordinance To Address These Problems**

20       On January 28, 2020, the County adopted the Ordinance. The Ordinance became

21   effective on February 27, 2020 became operative on July 1, 2020. (ECF No. 1-2, p. 7.) It

22   defines an "Electronic Smoking Device" as:

23       [A]n electronic and/or battery-operated device, which can be used to deliver
         an inhaled dose of nicotine or other substances whether manufactured,
24       distributed, marketed, or sold as an electronic cigarette, an electronic cigar,
         an electronic cigarillo, an electronic pipe, or any other product name or
25       descriptor. For the purposes of this chapter, "electronic smoking device"

26   _____

27   [7] US Department of Health and Human Services. E-cigarette use among youth and
    young adults. Atlanta, GA: US Department of Health and Human Services, CDC; 2016.
28   https://www.cdc.gov/tobacco/data_statistics/sgr/e-
    cigarettes/pdfs/2016_sgr_entire_report_508.pdf.

does not include any product that the Food and Drug Administration has either granted premarket approval, or approved for use as a tobacco cessation product or for other therapeutic purposes where the product is marketed and sold solely for such an approved purpose.

San Diego County Code of Regulatory Ordinances ("SD Code") § 32.892(b). It defines "Flavored Smoking Product" as:

[A] product containing, made, or derived from ***tobacco or nicotine*** that is intended for smoking, and ***that emits a taste or smell, other than the taste or smell of tobacco, including, but not limited to, any taste or smell relating to fruit, menthol, mint, wintergreen, chocolate, cocoa, vanilla, honey, candy, dessert, alcoholic beverage, herb, or spice***.

*Id.* § 32.882(b) (emphasis added).

## III.   THE COMPLAINT SHOULD BE DISMISSED WITH PREJUDICE

Rule 12(b)(6) permits a party to move to dismiss a complaint on the grounds that it "fail[s] to state a claim upon which relief can be granted." The Court reviews whether a complaint states sufficient facts and a cognizable legal theory in light of Rule 8(a), which requires a "short and plain statement of the claim showing that the pleader is entitled to relief." Although Rule 8 "does not require 'detailed factual allegations,' . . . it [does] demand[] more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). In other words, "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 677 (quoting *Twombly*, 550 U.S. at 570); see also Fed. R. Civ. P. 12(b)(6).

As demonstrated below, the Complaint does not contain any factual matter showing that Plaintiffs' claims are plausible and there are no amendments Plaintiffs could allege to make their claims plausible. Accordingly, the Complaint should be dismissed with prejudice.

///

///

9

A.    The Federal Act Does Not Preempt the County's Ordinance

Plaintiffs' sole claim is that the Ordinance is preempted. Plaintiffs are wrong. "When addressing questions of express or implied pre-emption, we begin our analysis with the assumption that ***the historic police powers of the States [are] not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.***" *Altria Grp., Inc. v. Good*, 555 U.S. 70, 77 (2008) (internal quotations omitted and emphasis added). A State or local government's powers to which a court should give deference include the "historic police powers to protect public health." *Graham v. R.J. Reynolds Tobacco Co.*, 857 F.3d 1169, 1188-89 (11th Cir. 2017). Given the States and local governments' primary, frontline role in regulating health and safety, if there are "plausible alternative readings[s]" of a preemption statute, "even if [the] alternative[s] were just as plausible," the court has a "duty to accept the reading that disfavors pre-emption" *Bates v. Dow Agrosciences L.L.C.*, 544 U.S. 431, 450 (2005). Put simply, "if there is ***any ambiguity*** as to whether the local and federal laws can coexist," this Court "must uphold the ordinance." *U.S. Smokeless Tobacco Mfg. Co., LLC v. City of New York*, 708 F.3d 428, 433 (2d Cir. 2013) (emphasis added). *See also Beaver v. Tarsadia Hotels*, 816 F.3d 1170, 1179 (9th Cir. 2016) (the "presumption" against preemption "carries the 'greatest force' when federal legislation encroaches on an area traditionally occupied by the states", and in such cases "when the text of a preemption clause is susceptible of more than one plausible reading, courts ordinarily accept the reading that disfavors pre-emption." [internal quotations omitted]).

Plaintiffs cannot establish that the Ordinance is expressly preempted by the Act. Nor can they establish that the Ordinance is impliedly preempted; it is not an impermissible obstacle to Congress's "clear and manifest purpose" in enacting the Act.

1.    <u>The Ordinance is Not Expressly Preempted</u>

"Express preemption analysis involves using statutory interpretation techniques to determine the extent of preemption described by the clause." *Gonzalez v. Drew Indus.*, 750 F. Supp. 2d 1061, 1065 (C.D. Cal. 2007). Statutory interpretation begins with the

plain meaning of the statute's language. *United States v. Flores*, 729 F.3d 910, 914 (9th Cir. 2013). Courts consider the specific provision at issue and also "the structure of the statute as a whole, including its object and policy." *Children's Hosp. & Health Center v. Belshe,* 188 F.3d 1090, 1096 (9th Cir. 1999). A court should give preference to the interpretation of a statute that gives meaning to every word and harmonizes all of its provisions. *See James v. City of Costa Mesa*, 700 F.3d 394, 402 (9th Cir. 2012). Interpretations of a statute producing "absurd results" should be avoided "if alternative interpretations consistent with the legislative purpose are available." *Griffin v. Oceanic Contractors*, 458 U.S. 564, 575 (1982). Further, "a statute should not be construed so as to render any of its provisions mere surplusage." *United States v. Wenner*, 351 F.3d 969, 975 (9th Cir. 2003). Courts also should not add an absent word to a statute. *First Amendment Coal. v. U.S. DOJ*, 878 F.3d 1119, 1132 (9th Cir. 2017); *see also Lamie v. U.S. Tr.*, 540 U.S. 526, 537 (2004) ("[T]here is a basic difference between filling a gap left by Congress' silence and rewriting rules that Congress has affirmatively and specifically enacted."). Applying these basic rules statutory interpretation, it is clear that the Act does not expressly preempt the County's Ordinance.

21 U.S.C. § 387p, which contains the Act's preemption clause, begins with a preservation clause in Section 387p(a)(1):

> Preservation. Except as provided in paragraph (2)(A), ***nothing in this chapter . . . shall be construed to limit the authority of . . . a State or political subdivision of a State*** . . . to enact, adopt, promulgate, and enforce any law, rule, regulation, or other measure with respect to tobacco products that is in addition to, or more stringent than, requirements established under this chapter, including a law, rule, regulation, or other measure ***relating to or prohibiting the sale***, distribution, possession, exposure to, access to, advertising and promotion of, or use of tobacco products by individuals of any age, information reporting to the State, or measures relating to fire safety standards for tobacco products.

21 U.S.C. § 387p(a)(1) (emphasis added). While the statute has some preemptive effect, such preemption is limited to state or local laws that attempt to set tobacco product *standards—i.e.*, standards for the *manufacture* of tobacco products:

///

> In general. No State or political subdivision of a State may establish or continue in effect with respect to a tobacco product any requirement which is different from, or in addition to, any requirement under the provisions of this chapter ***relating to tobacco product standards***, premarket review, adulteration, misbranding, labeling, registration, good manufacturing standards, or modified risk tobacco products.

*Id.* § 387p(a)(2)(A) (emphasis added). But the next subsection of the Act then carves out an exception to such federal preemption (the so-called "savings clause") that expressly allows state and local governments to regulate the *sale* of tobacco products:

> Exception. Subparagraph (A) ***does not apply to requirements relating to the sale***, distribution, possession, information reporting to the State, exposure to, access to, the advertising and promotion of, or use of, tobacco products by individuals of any age, or relating to fire safety standards for tobacco products . . . .

*Id.* § 387p(a)(2)(B) (emphasis added).

Despite this unambiguous language, Plaintiffs contend that the Ordinance is preempted because it purportedly conflicts with 21 U.S.C. § 387g(a), which sets the following "Special rule for cigarettes" that imposes certain product standards for cigarettes,[8] and gives the Food and Drug Administration ("FDA") the ability to revise it:

> Beginning 3 months after [June 22, 2009], a cigarette or any of its component parts (including the tobacco, filter, or paper) ***shall not contain, as a constituent*** (including a smoke constituent) or additive, an artificial or natural flavor (other than tobacco or menthol) or an herb or spice, including strawberry, grape, orange, clove, cinnamon, pineapple, vanilla, coconut, licorice, cocoa, chocolate, cherry, or coffee, that is a characterizing flavor of the tobacco product or tobacco smoke.

21 U.S.C. §§ 387g(a)(1)(A) and (a)(2) (emphasis added). Plaintiffs, however, virtually ignore the primary question posed here with little analysis—whether the County's ***sales ban*** can fairly be characterized as setting a tobacco product standard.

In *U.S. Smokeless Tobacco*, the Second Circuit considered whether a New York City ordinance that prohibited the sale of "any flavored tobacco product except in a

---

[8] Section 387g sets out an "Additional special rule" related to the use of foreign tobacco containing "a pesticide chemical residue that is at a level greater than is specified by any tolerance applicable under Federal law to domestically grown tobacco." 21 U.S.C. § 387b(a)(1)(B). Plaintiffs, however, do not argue that this second "special rule" has any alleged preemptive force here.

tobacco bar" was federally preempted. 708 F.3d at 431. The Second Circuit rejected the plaintiff's federal preemption argument:

> [T]he preservation clause . . . expressly *preserves* localities' traditional power to adopt any 'measure relating to or prohibiting the sale' of tobacco products. 21 U.S.C. § 387p(a)(1). That authority is limited only to the extent that a State or local regulation contravenes one of the specific prohibitions of the preemption clause.

*Id.* (emphasis in original). The Second Circuit rejected the plaintiff's attempt to characterize the New York City ordinance as "relating to tobacco product standards," noting that the Act's preemption clause "reserves regulation at the ***manufacturing*** stage exclusively to the federal government, but allows states and localities to continue to regulate ***sales and other consumer-related aspects of the industry*** in the absence of conflicting federal regulation" in one of the preempted areas (*i.e.*, tobacco standards). *Id.* at 433-34 (emphasis added).

The Second Circuit also explained that viewing the New York City ordinance at issue as an indirect regulation of manufacturing would be absurd because such a reading would:

> Collapse[] the distinction between sales and product regulations, would render superfluous § [387p]'s three-part structure, and in particular would vitiate the preservation clause's instruction that the Act not be "construed to limit the authority of . . . a State or political subdivision of a State . . . to enact . . . and enforce any . . . measure . . . prohibiting the sale . . . of tobacco products," 21 U.S.C. § 387p(a)(1). Because "[s]tatutes should be construed, if possible, to give effect to every clause and word," *Cal. Pub. Emps.' Ret. Sys. v. WorldCom, Inc.*, 368 F.3d 86, 106 (2d Cir. 2004), and in light of our presumption that Congress has not limited the exercise of local police powers, we adopt a narrower reading of the preemption clause that also gives effect to the preservation clause.

*U.S. Smokeless Tobacco*, 708 F.3d at 434. This is true even though "[a]ny finished product can be described in terms of its components or method of manufacture." *Id.*

While tobacco products with flavors other than tobacco "can arguably be described either as a category of finished product or as products that are manufactured with ingredients that impart a flavor" the former makes more sense. New York City did not care how the tobacco was manufactured or which ingredients were used to make flavored

13

tobacco, but simply that it had a flavor other than tobacco. *Id*. at 435 (New York ordinance concerned "whether final tobacco products are ultimately characterized by – or marketed as having – a flavor" and "is not easily read to direct manufacturers as to which ingredients they may or may not include in their products."). Such a law did not "clearly infringe on the FDA's authority to determine what chemicals and processes may be used in making tobacco products." *Id.* at 435.[9] Consequently, it was not a tobacco product standard subject to the preemption clause. *See also Nat'l Ass'n of Tobacco Outlets, Inc. v. City of Providence, Rhode Island*, 731 F.3d 71, 81 (1st Cir. 2013) (rejecting the plaintiffs' argument, that a "Flavor Ordinance" enacted in Providence, Rhode Island, which provided that "[i]t shall be unlawful for any person to sell or offer for sale any flavored tobacco product to a consumer, except in a smoking bar", imposed a "product or manufacturing standard in violation of the preemption provision" of the Act); *Independents Gas & Service Stations Assocs., Inc. v. City of Chicago*, 112 F. Supp. 3d 749, 754 (N.D. Ill. 2015) (ordinance that barred the sale of "flavored tobacco product" near schools not preempted because it "regulates flavored tobacco products without regard for how they are manufactured," unlike "an ordinance that banned tobacco products flavored using a particular manufacturing process"). See also RJN, Ex. 1, p. 8 and Ex. 2, p. 10 (rejecting challenges to L.A. County ordinance banning the sale of flavored tobacco products because "A prohibition on the sale of a distinct product is simply not a product standard.") The Second Circuit recognized that the plaintiff's argument failed under the federal preemption clause, and did not even need to reach the

_____

[9] The fact that Congress did not itself choose to ban menthol-flavored cigarettes is of no moment because, as noted in the main text, the Act expressly preserves for state and local governments the right to prohibit sales. *U.S. Smokeless Tobacco*, 708 F.3d at 433 ("While § 907(d)(3) prohibits the FDA from banning entire categories of tobacco products throughout the country, 21 U.S.C. § 387g(d)(3), the Act nowhere extends that prohibition to state and local governments. To the contrary, the preservation clause of § 916 expressly *preserves* localities' traditional power to adopt any 'measure relating to or prohibiting the sale' of tobacco products" (footnote omitted)). In fact, if the County so chose, it *could* ban cigarettes altogether, but has not. As courts have explained in rulings against one of the Plaintiffs here in prior cases, Congress prohibited the FDA, but not state and local governments, from altogether banning the sale of tobacco. *See, e.g., Major v. R.J. Reynolds Tobacco Co.,* 14 Cal. App. 5th 1179, 1191 (2017) (citing 21 U.S.C. § 387p(a)(1)).

1  savings clause. *U.S. Smokeless Tobacco*, 708 F.3d at 435 ("In any event, even if the
2  ordinance were construed as establishing a product standard that falls within [the]
3  preemption provision, it would not be preempted, because it also falls within that
4  section's savings clause.").

5  The same is true here: the analysis ends with the preemption clause, without any
6  need to reach the savings clause. The County's Ordinance is no different than those
7  upheld in *U.S. Smokeless Tobacco*, *Nat'l Association of Tobacco Outlets*, and
8  *Independents Gas & Service Stations* in the sense that the County is not attempting to tell
9  manufactures how to *make* their products. Rather, the Ordinance bans the *sale* of a final
10 product, *i.e.*, tobacco products with "a taste or smell, other than the taste or smell of
11 tobacco" *regardless* of how that taste or smell comes to be, and electronic smoking
12 devices, which sales regulations the Act expressly preserves for state and local
13 governments.

14 Plaintiffs contend that the Ordinance is preempted because it includes an exception
15 for shisha, a type of tobacco typically smoked via a hookah,[10] which shows the Ordinance
16 is really a product standard. *See* SD Code §§ 32.882(c) and 32.883(c). This exception is
17 **not** to enact a manufacturing standard. Rather, this exception was included in recognition
18 of the fact that the EVALI crisis occurring in the summer of 2019 was not linked to
19 hookahs or water pipes, but to electronic smoking devices, which are used by the vast
20 majority of youths, SD Code § 32.891(g), and in recognition of the cultural significance
21 of hookahs to many of Middle Eastern descent.[11] The Ordinance does not regulate the
22 manufacture of tobacco, but rather bans the sale of nearly all forms of flavored tobacco
23 based on their sensory impact on the consumer. It is nothing more than an ordinance

24 _____
25 [10] "A 'hookah' is a device for smoking tobacco. It contains coals that cause the
tobacco to smoke. A user's inhalation through a tube causes the smoke to travel through
26 water, which cools and filters the smoke, before it reaches the user. The water is held in a
container at the base of the hookah." *Inhale, Inc. v. Starbuzz Tobacco, Inc.*, 755 F.3d
1038, 1040 n.1 (9th Cir. 2014).
27 [11] Martinasek MP, Haddad LG, Wheldon CW, Barnett TE. Beliefs and Attitudes
Associated With Hookah Smoking Among a United States College Population. *Respir*
28 *Care*. 2017;62(3):370-379. doi:10.4187/respcare.05069.

1   "relating to ... the sale" of specific types of tobacco, which is expressly permitted by the

2   Act's preservation clause. 21 U.S.C. § 387p(a)(1). This Court should follow the

3   reasoning in *U.S. Smokeless Tobacco*, *Nat'l Association of Tobacco Outlets*, and

4   *Independents Gas & Service Stations*, and hold that the Ordinance is not preempted as an

5   attempt to enact "tobacco product standards."

6         *Nat'l Meat Ass'n v. Harris*, 565 U.S. 452 (2012), upon which Plaintiffs rely does

7   not change this conclusion. That case considered whether the Federal Meat Inspection

8   Act ("FMIA"), which regulates slaughterhouses, preempted a "California law dictating

9   what slaughterhouses must do with pigs that cannot walk . . . ." *Id.* at 455. The FMIA's

10  preemption provision provides:

11        Requirements within the scope of this [Act] with respect to premises,

12        facilities and operations of any establishment at which inspection is provided
          under . . . this [Act], which are in addition to, or different than those made

13        under this [Act] may not be imposed by any State.

14  21 U.S.C. § 678. Thus, unlike the preemption clause in the Act, the preemption clause in

15  *Nat'l Meat Ass'n* did not contain a preservation clause or "a savings clause that expressly

16  exempted regulations 'relating to the sale' of the product from preemption." *Nat'l*

17  *Association of Tobacco Outlets*, 731 F.3d at 82.

18        The California law at issue in that case was preempted because it fell squarely

19  within that preemption provision, as it was directed at the manufacture or processing of

20  meat products: "No slaughterhouse shall process, butcher, or sell meat or products of

21  nonambulatory animals for human consumption." *Nat'l Meat Ass'n*, 565 U.S. at 459

22  (quoting Cal. Penal Code § 599f(b)). The sales ban, in turn, was "a criminal proscription

23  calculated to help implement and enforce each of the section's other regulations," which

24  fell within the preemption provision. *Id.* at 463-64. Here, by contrast, the County has not

25  attempted to tell tobacco manufacturers how to make their products and the Ordinance's

26  sales ban is not a mechanism to facilitate enforcement of some other provision regulating

27  the manufacture of tobacco products. Just as was the case in *U.S. Smokeless Tobacco*, the

28  sales ban in the Ordinance is just a sales ban, and does not trigger the Act's preemption

provision, with the result that there is no need to then also consider the savings clause. *U.S. Smokeless Tobacco*, 708 F.3d at 435 n.2 (distinguishing *Nat'l Meat Ass'n* because the California law "expressly prohibited the sale of meat that was not produced in accordance with specific rules to be applied at the slaughterhouse," but the New York City ordinance "does not concern itself with the mode of manufacturing, or with the ingredients that may be included in tobacco products").

Assuming, *arguendo*, that the County's Ordinance triggered the preemption clause (it does not) and the Court then was required to address the savings clause, Plaintiffs' preemption argument still would fail. The Act's savings clause works to save "requirements relating to the sale" of tobacco products that would otherwise be preempted. 21 U.S.C. § 387p(a)(2)(B). The Ordinance imposes a requirement relating to a sale: in order to be sold, the product cannot have a flavor *other* than that of tobacco itself. The Ordinance does not outright ban *all* cigarettes and *all* smokeless tobacco products. Rather, it expressly permits the sale of those products so long as they are tobacco flavored, and not mint, cotton candy, bubble gum, or any other flavors used to lure children into nicotine addiction. That a product can only be tobacco flavored is a "requirement" for a sale, not a prohibition on the manufacture of cigarettes or smokeless tobacco.

Nor does *In re Fontem*, No. SACV 15-01026 JVS (RAOx), 2016 WL 6520142 (C.D. Cal. Nov. 1, 2016) help Plaintiffs. That case did not consider whether a sales ban amounted to a product standard. On the contrary, it considered whether the plaintiff's claims, which sought to require the defendants "to disclose that their Products cause exposures to toxic chemicals other than nicotine", ran afoul of the preemption of tobacco *labeling* requirements. *Id.* *11. *Harris v. R.J. Reynolds Vapor Company*, No. 15-cv-04075-JD, 2017 WL 3617061 (N.D. Cal. Aug. 23, 2017), and *Colgate v. JUUL Labs, Inc.*, 402 F. Supp. 3d 728, 736 (N.D. Cal. 2019), similarly are inapposite because, they do not consider whether a ban on sales constitutes a regulation of a tobacco product standard. Again, as explained above, the Ordinance is not an attempt to set a "tobacco

product standard," and thus falls outside the preemption clause and is preserved for the States and local governments.

Simply put, just as was the case in *U.S. Smokeless Tobacco*, the Ordinance does not impose tobacco standards, *i.e.*, it does not regulate the manufacturing process. Rather, it regulates sales, an area specifically preserved for state and local governments. If there were any doubt and one views the Act as somewhat ambiguous, the County's interpretation is more than plausible—it is supported by every case to have considered this issue directly. Thus, the Court has a "duty to accept the reading that disfavors pre-emption" *Bates*, 544 U.S. at 450; *see also Beaver*, 816 F.3d at 1179 ("[W]hen the text of a pre-emption clause is susceptible of more than one plausible reading, courts ordinarily accept the reading that disfavors pre-emption.").

## 2. <u>The Ordinance is Not Impliedly Preempted</u>

Plaintiffs also contend that the Ordinance is impliedly preempted. A State or local government, however, "may employ its police power to regulate cigarette sales" unless there is "clear and manifest purpose of Congress" to supersede such "historic police powers" *Graham*, 857 F.3d at 1191. *See also Association des Éleveurs de Canards et d'Oies du Quebec v. Becerra*, 870 F.3d 1140, 1149 (9th Cir. 2017) ("As with express preemption, courts assume that the historic police powers of the States are not superseded unless that was the clear and manifest purpose of Congress." (internal quotations omitted)). Congress has manifested no such intent here.

Congress enacted an express preemption provision "defining the pre-emptive reach" of the Act on State and local regulation of tobacco sales more broadly. This "implies that matters beyond that reach are not pre-empted." *Association des Éleveurs*, 870 F.3d at 1149 (quoting *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 517 (1992)); *Graham*, 857 F.3d at 1186 ("Congress' intent, of course, primarily is discerned from the language of the pre-emption statute and the 'statutory framework' surrounding it.").

///

///

18

Nor can Plaintiffs credibly claim that the Act reflects "Congress' and FDA's judgment that certain flavored tobacco products should remain on the market,"[12] even through Congress did not say so in the Act's preemption provisions. Such a claim is built on two false premises: (1) that Congress intended to keep cigarettes on the market; and (2) that, by delegating to the FDA whether to adopt national tobacco product *standards* for menthol cigarettes, Congress intended to foreclose state and local governments from deciding whether to ban the *sale* of menthol-flavored cigarettes.

### a. Congress Did Not Intend to Prevent State and Local Governments From Banning Tobacco Sales, Even Completely

Congress intended to allow state and local governments to ban tobacco sales, even completely, if they so desired. The Act's legislative history makes this clear. Initial drafts of the Act included a prohibition on state and local tobacco sales bans, but the bill later was revised to remove any such prohibition. *U.S. Smokeless Tobacco*, 708 F.3d at 434 n.1 (explaining that draft versions of the bill "would have expressly reserved to the federal government authority to ban the sale of entire categories of tobacco products", but "[t]hese draft versions . . . were eventually rewritten to deny such power only to the FDA, and as enacted into law, this provision of the Act does not forbid such bans by state and local governments."); *compare* RJN, Ex. 6, H.R. 1376, 109th Cong. § 907(b)(3) (2005) ("Power Reserved to Congress: Because of the importance of any decision to issue a regulation establishing a performance standard—(A) eliminating all cigarettes, all smokeless tobacco products, or any similar class of tobacco products, or (B) requiring the reduction of nicotine yields of a tobacco product to zero, Congress expressly reserves to itself the power to make such a decision.") *and* 21 U.S.C. § 387g ("Limitation on power granted to the Food and Drug Administration: Because of the importance of a decision of the Secretary to issue a regulation—(A) banning all cigarettes, all smokeless tobacco

---

[12] Plaintiffs again do not explain if or how this argument applies to the myriad of other tobacco flavors.

1    products, all little cigars, all cigars other than little cigars, all pipe tobacco, or all roll-

2    your-own tobacco products; or (B) requiring the reduction of nicotine yields of a tobacco

3    product to zero, the Secretary is prohibited from taking such actions under this chapter.").

4    *See also Berger v. Philip Morris USA, Inc.*, 185 F. Supp. 3d 1324, 1340-41 (M.D. Fla.

5    2016), *aff'd sub nom. Cote v. R.J. Reynolds Tobacco Co.*, 909 F.3d 1094 (11th Cir. 2018)

6    ("[S]tatelaw prohibitions on cigarette sales can stand side-by-side with the fact that

7    Congress has tolerated cigarettes and purposefully refrained from banning them."). This

8    case law, in addition to the plain language of the preservation clause of the Act, which

9    expressly permits state and local governments to "prohibit[] the sale" of tobacco products

10   without qualification, negates Plaintiffs' contention of implied preemption

11          Moreover, in *Major v. R.J. Reynolds Tobacco Co.*, 14 Cal. App. 5th 1179 (2017),

12   the court considered the Act and confirmed that it did not inject a new requirement to

13   prohibit state and local governments from banning the sale of cigarettes across-the-board

14   in their jurisdiction. *Id.* at 1193; *see also Berger*, 185 F. Supp. 3d at 1340-41 ("Congress

15   thus made plain [in the Act] what one would otherwise presume: that the states retained

16   broad authority to regulate cigarettes, and specifically, to ban their sale, distribution,

17   possession, or use outright."). Congress has never expressed an intent to take that

18   authority away from state and local governments and Plaintiffs point to no post-Act court

19   decision, statute, regulation, or legislative history indicating otherwise.

20          In any event, even if Congress had intended to preempt complete cigarette or

21   tobacco bans, the County's Ordinance is not such a ban. Courts have taken a narrow view

22   of what constitutes a complete ban. As noted above, the Ordinance still permits the sale

23   of tobacco-flavored products, and thus cannot qualify as a total ban. *See, e.g., Izzarelli v.

24   R.J. Reynolds Tobacco Co.,* 701 F. App'x 26, 32-33 (2d Cir. 2017) (rejecting argument

25   that permitting plaintiff's theory of liability in a tort case—that R.J. Reynolds' Salem

26   King brand of menthol cigarettes was unreasonably dangerous—would "amounts to a ban

27   on all cigarettes sold in Connecticut" because the Plaintiffs' theory was based on

28   characteristics of R.J. Reynolds' cigarettes "that were not common to cigarettes in

general"); *Kuhne v. Reynolds*, No. 3:01CV1090 (WWE), 2019 WL 959678, at **1-2 (D. Conn. Feb. 27, 2019) (rejecting the argument that a tort verdict would be preempted as an effective ban because "[P]laintiffs seek to present evidence concerning the specific design of the Salem cigarettes"); *Major*, 14 Cal. App. 5th at 1188-89 (suggesting a state law, which plaintiffs characterized as the "functional equivalent" of a ban on "virtually all cigarettes sold in the United States . . . except the handful of no-tar cigarettes which had a negligible market share", would not be a total ban); *Evans v. Lorillard Tobacco Co.*, 465 Mass. 411, 431 (2013) (rejecting cigarette manufacturers' argument that "the jury essentially found that all cigarettes were defective" because the proposed alternative was "a cigarette without menthol where the carcinogens in the tar are at a level that is relatively safe and where the level of nicotine is nonaddictive", explaining "[w]e do not accept Lorillard's implicit suggestion that every cigarette, to be a cigarette, must contain levels of tar that cause a high risk of cancer and levels of nicotine that are addictive"). Congress did not clearly intend to preempt bans on the sale of cigarettes, let alone a ban limited to flavored tobacco products.

> **b. Congress Did Not Intend To Foreclose State And Local Governments From Deciding Whether To Ban The Sale Of Flavored Tobacco By Delegating The Establishment Of National Product Standards For Menthol-Flavored Cigarettes To The FDA.**

Contrary to Plaintiffs' assertion, Congress's delegation to the FDA of whether to adopt national tobacco product *standards* for menthol-flavored cigarettes does not suggest that Congress intended to foreclose state and local government bans on the *sale* of menthol-flavored cigarettes. At most, Section 387g suggests that, at the federal level, Congress was not ready to make a decision itself on menthol, and left a decision as to menthol-flavored product standards at the federal level to the FDA. But that federal level decision-making power says nothing about whether state and local governments are

///

No. 20-cv-01124-H-WVG

1    thereby prevented from enacting *sales* bans in their local jurisdictions consistent with the

2    Act's preservation clause.

3    The plain language of the preservation clause permits state and local governments

4    to "prohibit[] the sale" of tobacco products without exception. Notably absent from the

5    Act's preservation clause—or even its preemption clause—and the FDA's regulations or

6    rulings is any language depriving state and local governments of the authority to ban the

7    sale of menthol-flavored cigarettes. Plaintiffs' argument would write the words "except

8    menthol-flavored tobacco products" into Section 387p(a)(1) so that it then would read as

9    follows:

10    Preservation. Except as provided in paragraph (2)(A), nothing in this chapter
      . . . shall be construed to limit the authority of . . . a State or political
11    subdivision of a State . . . to enact, adopt, promulgate, and enforce any law,
      rule, regulation, or other measure with respect to tobacco products that is in
12    addition to, or more stringent than, requirements established under this
      chapter, including a law, rule, regulation, or other measure relating to or
13    prohibiting the sale, distribution, possession, exposure to, access to,
      advertising and promotion of, or use of tobacco products [***except menthol-***
14    ***flavored tobacco products***] *by individuals of any age, information reporting
      to the State, or measures relating to fire safety standards for tobacco*
15    *products.*

16    21 U.S.C. § 387p(a)(1). Congress could have included such language, but did not do so.

17    Thus, Congress did not express a "clear and manifest" intent to preempt state and local

18    bans on the sale of menthol-flavored cigarettes, and the County's Ordinance is not

19    preempted. Without such a clear and manifest intent expressed by Congress, the Court

20    must honor the presumption *against* preemption, and interpret the Act to leave the

21    Ordinance intact. *Bates*, 544 U.S. at 450 (a court has a "duty to accept the reading that

22    disfavors preemption"); *Beaver*, 816 F.3d at 1179 ("[W]hen the text of a pre-emption

23    clause is susceptible of more than one plausible reading, courts ordinarily accept the

24    reading that disfavors pre-emption.").

25    ///

26    ///

27    ///

28    ///

**IV.    CONCLUSION**

For all of the foregoing reasons, the Court should dismiss the Complaint with prejudice.

DATED: August 3, 2020                    THOMAS E. MONTGOMERY, County Counsel

By: s/Joshua M. Heinlein
    JOSHUA M. HEINLEIN, Senior Deputy
Attorneys for COUNTY OF SAN DIEGO
E-mail: Joshua.heinlein@sdcounty.ca.gov

23